UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BARBARA NICHOLSON, MARSHA BEDNARSKI, and RATHIKA RAJARAVIVARMA,<br>　　　Plaintiffs,<br><br>v.<br><br>BOARD OF TRUSTEES FOR THE CONNECTICUT STATE UNIVERSITY SYSTEM, CENTRAL CONNECTICUT STATE UNIVERSITY, and PRESIDENT JACK MILLER, in his individual capacity,<br>　　　Defendants. | :<br>:<br>:　　3:08cv1250 (WWE)<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT**

In this action, plaintiffs Barbara Nicholson, Marsha Bednarski, and Rathika Rajaravivarma assert that the denial of their respective requests for promotions and tenure by defendants Board of Trustees for the Connecticut State University System ("CSUS"), Central Connecticut State University ("CCSU") and Jack Miller, President of CCSU, constitute violations of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the Connecticut Fair Employment Practices Act (CFEPA).

Specifically, the complaint alleges disparate treatment of each plaintiff on the basis of gender in violation of Title VII against CSUS and CCSU (count one); disparate treatment of plaintiff Rajaravivarma on the basis of her race and national origin in violation of Title VII against CSUS and CCSU (count two); a continuing course of discrimination against plaintiff Rajaravivarma on the basis of her race and national origin in violation of 42 U.S.C. § 1981 and § 1983 against President Miller (count three); and disparate impact discrimination on the basis of gender in violation of Title VII and

CFEPA against President Miller, CSUS and CCSU (count four).

The parties have filed cross motions for summary judgment. Plaintiffs have agreed that summary judgment should enter on the claim of disparate impact in violation of Title VII and CFEPA (count four).[1]

## BACKGROUND

The parties have filed statements of facts along with supporting exhibits and affidavits. These materials reflect the following factual background.

At the time relevant to this action, plaintiffs Bednarski, Nicholson and Rajaravivarma were female professors at CCSU.

Plaintiffs were members of the Connecticut State University American Association of University Professors ("AAUP") union. Thus, a collective bargaining contract governed decisions concerning promotion and tenure. Pursuant to the contract, each faculty member's portfolio is evaluated for quality within specific categories, which are accorded weight in the order listed: (1) "load credit activity;" (2) creative activity appropriate to one's field, which includes delivering papers at professional conferences, research, study and publication; (3) productive services to the department and university; (4) professional activity, such as attendance and participation at conferences and workshops, membership in appropriate professional organizations and other professional activities; and (5) years in rank.

The applicant's Department Evaluation Committee ("DEC"), academic dean and the Promotion and Tenure Committee ("PTC") each make a recommendation as to

---

[1] To the extent that plaintiffs allege any other violation of CFEPA, such claim is also withdrawn.

promotion or tenure after evaluating the applicant's portfolio according to the specific categories.  Finally, the CCSU President recommends whether an applicant should be promoted or given tenure after evaluating the applicant's portfolio according to the specific contractual categories.  The President of CCSU has the authority to designate the final list that is submitted to the Board of Trustees, which then announces the final promotion and tenure decision.[2]

In 1995, plaintiff Nicholson commenced work as an Assistant Professor of Biology.  In 2001, she was promoted to Associate Professor and granted tenure.  In 2005, she applied for a promotion to full professor.  The DEC, Dean Susan Pease, and the PTC recommended that Nicholson be promoted to full professor.  President Miller did not recommend her for such a promotion.

President Miller asserts that he rejected her application for promotion because he found (1) her student evaluations to be average, (2) her teaching to be adequate but not very strong, and (3) her creative activity to be lacking in areas of publications or service to the university.  He also noted that she had minimal work on grants.

Plaintiff Bednarski began working at CCSU as an adjunct professor of Science Education in 1989.  In 1997, Bednarski was hired into a tenure track position, and in April 2004, she received tenure.[3]

During the 2005-2006 academic year, Bednarski applied for a promotion to full professor.  The DEC, Dean Pease, and the PTC recommended Bednarski for

---

[2] The role of the Board of Trustees in faculty promotion and tenure is to act upon the recommendation of the President.

[3] Defendant Miller was not President of CCSU at that time.

promotion to full professor.  President Miller did not recommend her for promotion.

President Miller asserts that he found Bednarski's service to CCSU and her teaching to be average at best with teaching evaluations that showed no evidence of excellence.

During the 2007-2008 academic year, Bednarski was promoted to full professor.

In 2001, plaintiff Rajaravivarma commenced her employment as an Assistant Professor in the Computer Science Department.  In September 2005, she applied for the first time for both promotion and tenure.  The DEC, Dean Pease and the PTC recommended Rajaravivarma for promotion and tenure.  President Miller did not recommend Rajaravivarma for either promotion or tenure.  According to President Miller, he rejected Rajaravivarma because he found the quality of her work in the load credit category insufficient to justify tenure and promotion.  He noted that she had listed 17 peer-reviewed publications in her portfolio that spanned 18 years, but that 10 of those publications were dated prior to 2001 and that 3 had yet to be presented or published.  He also found that some of the publications listed were papers that she had presented at regional conferences, and she did not indicate that she had received external grants or had made any attempt to obtain external funding.

The AAUP filed a grievance on behalf of plaintiffs and another female professor regarding the denials of their applications for promotion and tenure.  After the grievances were settled, President Miller reconsidered each of the applications.  As part of this process, he requested Dean Pease to review the portfolios of Nicholson, Bednarski and Rajaravivarma.

Upon reconsideration, Dean Pease recommended Nicholson and Bednarski for

4

promotion, but she did not recommend Rajaravivarma for promotion or tenure.

As part of the reconsideration process, President Miller met with the PTC to ask questions about each applicant.  Nevertheless, President Miller adhered to his prior decisions regarding the plaintiffs, although he did recommend the other female professor that he had previously rejected for a promotion.

During the 2005-2006 academic year, 32 faculty members applied for promotions, 20 of whom were male and 12 of whom were female.  The female professors included 9 Caucasians, 1 African American, 1 Native American and plaintiff Rajaravivarma, who is Indian but is identified as Asian by defendants' records.  Of the 20 male professors, 19 were Caucasians and 1 was Hispanic.  Defendants promoted 19 faculty members, 15 of whom were Caucasian males.  Barry Westcott, a Caucasian male, received a promotion although the PTC had not recommended him based on his load credit activity.  The remaining four professors who received promotions were 2 Caucasian females, 1 Hispanic female, and 1 African-American female.[4]

Relevant to tenure applications, 13 faculty members applied for tenure.  Plaintiff Rajaravivarma was the only applicant who was rejected.  Of the 12 faculty members who received tenure, 5 were Caucasian males, 6 were Caucasian females, and 1 was an Asian female.

James Mulrooney was granted tenure although his dean had not recommended him for tenure.  Maria Mitchell, a non-Indian female, was granted tenure despite what plaintiffs assert was a weaker portfolio with no peer-reviewed publications, only one

---

[4] The 13 faculty members who were denied promotions included 4 Caucasian males, 7 Caucasian females, 1 Native-American female, and plaintiff Rajaravivarma.

5

national presentation and a few local presentations.

The CCSU Affirmative Action Office conducted investigations into plaintiffs' complaints of discrimination. These investigations concluded that there was insufficient evidence to support the claims of discrimination.

In an email dated August 16, 2006 to Anne Ailing, Chief Human Resources Officer for CCSU, the AAUP requested that CCSU "retain all of the 2005-2006 [promotion and tenure] files pending a potential CHRO action." The email requested that CCSU photocopy the complete file prior to returning any original file to an individual faculty member. The email stated: "To the extent documents are known to be potential evidence in anticipated or pending litigation, the employer is generally required to retain copies so that they would be available to the plaintiff in the discovery process."

In September 2006, defendants notified the applicants that they could pick up their portfolios.

In September 2008, defendants requested that applicants retain documents related to plaintiffs' litigation of their discrimination claims (the "2008 Litigation Hold"). In an April 2009 email, Ailing contacted the applicants to request that each one inform her what he or she retained of the portfolio submitted in the 2005-2006 academic year and whether that portfolio could be reassembled; she also instructed the applicants not to destroy or alter any portfolio documents "since they may be needed in connection with this case."

As of this date, only one complete and unaltered portfolio from the 2005-2006 applicant pool other than those of the plaintiffs exists.

**DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not satisfied. Liberty Lobby, 477 U.S. at 24.

<u>Plaintiffs' Motion for Summary Judgment</u>

Plaintiffs maintain that the Court should enter judgment in their favor as a sanction for defendants' alleged knowing spoliation of the portfolios of the other 2005-2006 applicants. Defendants counter that such a sanction is inappropriate because the portfolios do not represent relevant evidence and because each portfolio belonged to the individual applicants.

Spoliation is the destruction or significant alteration of evidence or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 457 (2d Cir. 2007).  An obligation to preserve evidence attaches to a party once that party has notice that the evidence is relevant to litigation or when that party should have known that the evidence may be relevant to future litigation.  Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).  Once a party reasonably anticipates litigation, the party "must suspend its routine document retention/destruction policy" and place a "litigation hold" on the relevant documents to ensure their preservation.  Doe v. Norwalk Cmty. Coll., 248 F.R.D. 372, 377 (D. Conn. 2007).  The duty to preserve extends to those employees likely to have relevant information, who are "key players" in the case.  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

In accordance with Federal Rule of Civil Procedure 37(b), a federal district court may impose sanctions against a party who has spoliated evidence.  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).   A district court has broad discretion in crafting a proper sanction for spoliation, but the sanction should promote prophylactic, punitive, and remedial purposes.  In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 149 (2d Cir. 2008).

A party seeking a spoliation sanction has the burden to establish that (1) the party having control over the evidence had an obligation to preserve it at the time the evidence was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the claim or defense at issue.  Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001).

Obligation to Preserve Evidence

In this instance, it is undisputed that defendants retained control over the portfolios as of August 16, 2006, when the AAUP provided notice of the potential for litigation and also requested that the portfolios be preserved.

The concept of "control" has been broadly construed.  In re Flag Telecom Holdings, Ltd. Sec. Litg., 236 F.R.D. 177, 180 (S.D.N.Y. 2006).  Control does not require that the party retain legal ownership or even actual physical possession of the documents; a party controls documents when that party has "the right, authority or practical ability" to obtain the documents from a non-party to the action.  In re NTL, Inc. Securities Litig., 244 F.R.D. 179 (S.D.N.Y. 2007).

Here, defendants had actual possession of the portfolios and also had the practical ability to obtain the portfolios from the applicants, who were employees of defendant CCSU.  Defendants could have copied the portfolios prior to allowing the applicants to take possession of the portfolios.  Despite their ability to control the preservation of the documents, defendants failed to place a litigation hold over the portfolios or to instruct applicants to preserve the documents for potential litigation.  In fact, defendants waited more than 2.5 years to place a litigation hold on the portfolios.  Accordingly, the Court finds that defendants had an obligation to preserve the documents as of August 16, 2006.

Culpable State of Mind

After a court has determined that a party was under an obligation to preserve the evidence it destroyed, the court must consider whether that party acted with sufficient culpability to warrant the imposition of sanctions.  Plaintiffs have the burden of showing

9

that the documents were destroyed either knowingly or negligently.  Byrnie, 243 F.3d at 108.

Generally, courts within the Second Circuit have found that the failure to preserve evidence resulting in the loss or destruction of relevant information constitutes negligence, and, depending on the circumstances, may be gross negligence.  See Treppel v. Biovail Corp., 249 F.R.D. 111, 121 (S.D.N.Y. 2008) (collecting cases).  In Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. L.L.C., 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010), a delay of 2 years to institute a litigation hold supported a finding of gross negligence.

A party's bad faith or grossly negligent destruction of evidence may be sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party.  Residential Funding v. DeGeorge Financial Corp., 306 F.3d 99, 109 (2d Cir. 2002).  However, negligent destruction of evidence results in spoliation sanctions only if the destroyed evidence was relevant.  Zublake, 220 F.R.D. at 220.

In this instance, defendants waited more than 2 years to place a litigation hold after they knew of the request for preservation of the portfolios due to potential litigation.  Defendants failed to make an adequate effort to preserve the evidence both prior to the return of the portfolios to the individual applicants and after the applicants reclaimed the portfolios.  As a result, the portfolios were destroyed, lost or altered.  Defendants' conduct constitutes gross negligence or at least negligence.  Accordingly, the Court must consider whether the lost material was relevant.

Relevance

For this purpose, relevance means more than that sufficient to satisfy Rule 401 of the Federal Rules of Evidence and instead requires "sufficient evidence from which a reasonable trier of fact could infer that the destroyed . . . evidence would have been of the nature alleged" by the moving party affected by its destruction. Residential Funding, 306 F.3d at 108–09. The moving party must show that the evidence would have been helpful in proving the asserted claims and that the party is thereby prejudiced without that evidence. Pension Comm. of the Univ. of Montreal Pension Plan, 685 F. Supp. 2d at 467.

Defendants argue that the portfolios do not represent relevant evidence because President Miller did not compare the applicants' portfolios and because such academic determinations involve a subjective process. As discussed further in this memorandum of decision, plaintiffs are entitled to prove that President Miller treated the applicants differently for discriminatory reasons. For purposes of establishing disparate treatment, plaintiffs' proof may comprise evidence relative to the qualifications considered of the other applicants outside the protected class. See Alungbe v. Bd. of Trs. of Conn. State Univ. Sys., 283 F. Supp. 2d 674 (D. Conn. 2003); Hinton v. City College of New York, 2008 WL 591802 at *16 (S.D.N.Y. 2008) (comparing qualifications of plaintiff to other male applicant for promotion). See also Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (discussing evidence of similarly-situated comparators that gives rise to inference of disparate treatment).

With only one portfolio remaining, plaintiffs are prejudiced in their ability to prove their claims through the well-established means of using comparative evidence. Thus,

sanctions are warranted based on spoliation of the evidence.

### Appropriate Sanction

Plaintiffs seek judgment in their favor as a sanction.

The appropriate sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position that party would have been in absent the wrongful destruction of evidence by the opposing party. Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir. 1998). Sanctions including judgment, an adverse inference, additional discovery and costs are available to remedy acts of spoliation. Zimmerman v. Poly Prep Country Day School, 2011 WL 1429221 (E.D.N.Y. 2011). Generally, a trial court should not order judgment where less drastic alternatives exist. See Dahoda v. John Deere Co., 216 Fed. Appx. 124, 125 (2d Cir. 2007).

Courts should impose the harshest sanction of judgment only where "willfulness, bad faith, or any fault" including gross negligence on the part of the offending party has been established. Southern New England Telephone Co. v. Global NAPS, Inc., 251 F.R.D. 82, 90 (D. Conn. 2008). Such egregious conduct warranting a terminating sanction may include intentional destruction of evidence such as burning or shredding documents, wiping out a computer hard drive or willful noncompliance with discovery obligations. In re A & M Florida Properties II, LLC, 2010 WL 1418861, *5 (S.D.N.Y. 2010) (citing cases).

Defendants maintain that copying the portfolio material was not necessary because President Miller did not compare the portfolios and because the decision to return the portfolios was supported by the opinion of Attorney David Trainor, the

12

Associate Vice-Chancellor for Human Resources. Further, defendants notified plaintiffs that they were returning the materials.

Although failure to preserve the documents by at the very least placing a timely litigation hold on the portfolios warrants some sanction, defendants' conduct is not so egregious as to merit a terminating sanction. An adverse inference that the evidence destroyed would have been unfavorable to defendants' defense is a less harsh sanction than judgment in plaintiffs' favor.

As discussed further in this decision, it remains a disputed issue whether President Miller made comparisons in his evaluation of the candidates, and plaintiffs are entitled to prove their claims by presenting evidence to persuade a jury of disparate treatment. Although plaintiffs will still need to prove that President Miller evaluated the candidates on an impermissible basis, an adverse inference based on spoliation presents a difficult hurdle for the spoliator to overcome. Zubulake, 220 F.R.D. at 220. Relevant to the extant procedural posture of this case, such an adverse inference may enable the non-spoliating party to survive summary judgment even in borderline cases. Byrnie, 243 F.3d at 111.

Defendants' Motion for Summary Judgment

Defendants argue that plaintiffs cannot establish their claims of disparate treatment on the basis of gender and that plaintiff Rajaravivarma cannot establish

disparate treatment on the basis of race or national origin in violation of Title VII and 42 U.S.C. § 1981.[5]

The Court must analyze plaintiffs' disparate treatment claims according to the burden shifting process established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). It is well settled that to establish a prima facie claim of discrimination, each plaintiff must demonstrate that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Although a plaintiff's initial burden is not onerous, she must show that her termination was not made for legitimate reasons. Thomas v. St. Francis Hosp. and Med. Ctr., 990 F. Supp. 81, 86 (D. Conn. 1998).

If a plaintiff establishes a prima facie case, a defendant must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. A plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). A plaintiff may show pretext by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action. Bombero v. Warner-Lambert Co., 142 F. Supp. 2d 196, 203 (D. Conn. 2000).

---

[5] Plaintiff Rajaravivarma has brought her Section 1981 claim pursuant to 42 U.S.C. § 1983. Section 1981 claims are governed by the same standards as those brought pursuant to Title VII. Wright v. Monroe Community Hosp., 2011 WL 3236224, *4 (W.D.N.Y. 2011).

In discrimination cases, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in the record as a whole.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  Disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision, although the court must respect an employer's discretion with respect to employment decisions that are not based on impermissible bias.  Byrnie, 243 F.3d at 103.

Circumstantial evidence of pretext may include evidence of departures from procedural regularity, Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997), shifting explanations, EEOC v. Ethan Allen, 44 F.3d 116, 120 (2d Cir. 1994), or statistics.  Stratton v. Dep't for the Aging for N.Y., 132 F.3d 869, 877 (2d Cir. 1997).  A plaintiff may also raise an inference of discrimination by showing that the employer treated plaintiff less favorably than a similarly situated employee outside a plaintiff's protected group.  Graham, 230 F.3d at 39.

In this instance, plaintiffs have satisfied their minimal burden to show a prima facie case.  There is no dispute that they are in a protected class and suffered adverse employment actions.  Plaintiffs have submitted statistical evidence that President Miller recommended significantly more male candidates for promotion than women; and evidence that he recommended for promotion and tenure certain Caucasian, male applicants who had not received favorable recommendation from the PTC or the relevant dean.

15

Plaintiff Rajaravivarma, a female of Indian national origin, was the only applicant to be denied tenure, although she had been recommended by the DEC, dean and PTC at the time of President Miller's initial review of her application.  She proffers that an inference of national origin or race discrimination is raised by the more favorable treatment of a non-Indian female applicant who has arguably lesser qualifications.

Plaintiffs' evidence coupled with the adverse inference afforded by defendants' spoliation of the actual portfolios indicates that the denials of promotion and tenure could have occurred under discriminatory circumstances.  Thus, the prima facie case is satisfied.

As their legitimate reason for the employment decisions, defendants maintain that President Miller reviewed each plaintiff's portfolio and made his decisions pursuant to the criteria set forth in the collective bargaining agreement without comparison among the applicants.  Defendants submit that the court should not second guess President Miller's judgment with respect to the qualifications of the candidates.

However, plaintiffs have also proffered Miller's notes that refer to the candidates' qualifications as average, above average or below average.  For instance, with respect to Nicholson, he wrote that her "evaluations look about average compared to all the others I have seen here.  Which are the data distinguishing her teaching from all the other candidates reviewed?"  Thus, the evidence suggests that President Miller may have made some comparative evaluations.

In light of the evidence raising inferences of discriminating circumstances on the prima facie case and the adverse inference due to the spoliation of evidence, Byrnie, 243 F.3d at 111, plaintiffs are entitled to submit their proof to a jury that the promotion

16

decisions were animated by a gender discriminatory animus.  Summary judgment will be denied as to the claims of gender discrimination relevant to the requests for promotion.

Relevant to Rajaravivarma's claim that she was denied a promotion due to her race and national origin, the Court notes that a significantly higher number of Caucasian faculty members received promotions than individuals of other races or national origin.  Such evidence coupled with the adverse inference raises genuine issues of fact as to the animus motivating defendants' decision.

The Court recognizes that Rajaravivarma's assertion that she was denied tenure on the basis of her gender is weakened by the fact that more female than male tenure candidates were successful.  However, a question of whether gender discrimination existed remains in light of the adverse inference, the fact that the only candidate to be rejected was female, and plaintiff's evidence that a male professor received tenure even though his dean had not recommended him.

Similarly, in light of the fact that an arguably less qualified female non-Indian received tenure and the adverse inference based on spoliation, the Court will allow the jury to determine whether Rajaravivarma's denial of tenure was motivated by discrimination based on race or national origin.

Accordingly, the Court will deny summary judgment on the Title VII and Section 1981 claims.

Qualified Immunity

Qualified Immunity

Defendants assert that the shield of qualified immunity is appropriate in this instance.

Under federal law, a federal officer is entitled to qualified immunity where (1) his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him or her to believe that such conduct was lawful at the time of the challenged act. Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007). The objectively reasonable test is satisfied if officers of reasonable competence could disagree on the legality of the defendant officer's actions. Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

The right to be free from discrimination with respect to employment decisions was "clearly established" at the time relevant to this action. Mickle v. Morin, 297 F.3d 114, 122 (2d Cir. 2002). In light of the disputed issues of fact relative to President Miller's decision making and the adverse inference resulting from the spoliation, the Court cannot determine whether it was objectively reasonable or whether reasonable officers could disagree on the legality of the challenged conduct. Accordingly, summary judgment will be denied.

## CONCLUSION

For the foregoing reasons, the cross motions for summary judgment [docs. # 73 and 76] are DENIED. However, plaintiffs are afforded an adverse inference that defendants allowed the spoliation of the portfolio materials because such evidence was

not favorable to their defense. At the trial, the Court will instruct the jury on the adverse inference due to spoliation.

_____/s/_____

Warren W. Eginton
Senior U.S District Judge

Dated this __12th__ day of September, 2011 at Bridgeport, Connecticut.